# United States Tax Court

160 T.C. No. 9

GLADYS L. GERHARDT, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 11127-20, 11128-20,
11129-20, 11146-20.

Filed April 20, 2023.

————

Ps contributed high-value, low-basis real estate and other property to charitable remainder annuity trusts (CRATs). The CRATs sold the contributed property and purchased five-year single premium immediate annuities (SPIAs) with most of the proceeds, naming Ps as recipients of the annuity payments. On their 2016 and 2017 tax returns, Ps took the position that the payments they received from the CRAT-funded SPIAs were not subject to tax, with the exception of small amounts Ps reported as interest. R examined Ps' tax returns and determined deficiencies, taking the position that, under I.R.C. §§ 664 and 1245, the annuity payments Ps received were distributions from the CRATs and taxable to them as ordinary income.

Two Ps, J and S, separately relinquished rental property and cash in exchange for other rental property in 2017. On their tax return for 2017, J and S took the position that gain from the disposition of the relinquished

---

[1] Cases of the following petitioners are consolidated herewith: Alan A. Gerhardt and Audrey M. Gerhardt, Docket No. 11128-20; Jack R. Gerhardt and Shelley R. Gerhardt, Docket No. 11129-20; and Tim L. Gerhardt and Pamela J. Holck Gerhardt, Docket No. 11146-20.

**Served 04/20/23**

property should be deferred because the transaction qualified as a like-kind exchange under I.R.C. § 1031. R did not dispute that the transaction met the requirements of I.R.C. § 1031, but determined that I.R.C. § 1245 precluded deferral of the gain.

J and S also sold certain property (MS) in 2017. They reported the net gain from the sale as ordinary income. R recomputed the amount of the gain and characterized it as long-term capital gain.

For T and P, two other Ps, R determined an accuracy-related penalty under I.R.C. § 6662(a) for 2016. T and P claim the penalty should not apply because they acted with reasonable cause and in good faith reliance on their advisers.

*Held*: The annuity payments Ps received from the CRAT-funded SPIAs in 2016 and 2017 were distributions from the CRATs and taxable to them as ordinary income under I.R.C. § 664.

*Held, further*, Ps have not met their burden of showing that R erred in characterizing the payments as ordinary income on the basis of I.R.C. §§ 664(b) and 1245.

*Held, further*, Ps' contrary arguments find no support in the Code, regulations, or caselaw.

*Held, further*, J and S have not met their burden of showing that R erred in determining that I.R.C. § 1245 precluded deferral of the gain realized from the disposition of the relinquished property.

*Held, further*, J and S offer no argument as to R's determinations concerning the sale of MS and have forfeited any objections on this point, so R's determinations with respect to the sale of MS stand.

*Held, further*, T and P have not met their burden of showing that they acted with reasonable cause and in good faith reliance on their advisers.

————

*Anita L. Steburg*, for petitioners.

*Stephen A. Haller*, for respondent.

OPINION

TORO, *Judge*: In these consolidated cases, petitioners (collectively, Gerhardts) contributed high-value, low-basis properties to charitable remainder annuity trusts (CRATs). The CRATs promptly sold the properties, purchased immediate annuities with most of the proceeds, and designated the Gerhardts as the recipients of the payments under the annuity contracts. In 2016 and 2017, the Gerhardts received payments from the CRAT-funded annuity contracts. The principal issue before us (which affects all petitioners) is whether those annuity payments are taxable to the Gerhardts. We conclude they are.

The Gerhardts maintain, essentially, that selling the high-value, low-basis properties through the CRATs and having the CRATs buy immediate annuities for their benefit allowed them to have most of the sale proceeds returned to them tax free over time. That view finds no support in the law governing CRATs or elsewhere. Rejecting the Gerhardts' "too good to be true" arguments and consistent with our holding in *Furrer v. Commissioner*, T.C. Memo. 2022-100, we conclude that the annuity payments they received in 2016 and 2017 are distributions from the CRATs and taxable to them as ordinary income under section 664.[2]

Also before us are three additional issues each affecting only some petitioners: (1) whether Jack and Shelley Gerhardt should have recognized ordinary income under section 1245 when they disposed of depreciated property as part of a section 1031 like-kind exchange, (2) whether Jack and Shelley Gerhardt's gain from the sale of depreciated property is long-term capital gain, and (3) whether Tim and

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

Pamela Gerhardt are liable for an accuracy-related penalty under section 6662(a). We find for the Commissioner on each issue.[3]

I.  *Docket Nos. 11127-20, 11128-20, 11129-20, 11146-20 (CRAT Issue)*[4]

## *Background*

### A.  *The Gerhardts' CRATs*

The Gerhardts apparently learned about using CRATs as a wealth-preservation strategy from John Eickhoff of Hoffman Associates, LLC, in 2015. Mr. Eickoff referred the Gerhardts to Aric Schreiner of Columbia CPA Group, LLC, for tax advice. In 2015, Mr. Schreiner presented the Gerhardts with a "CRAT strategy." The record does not disclose the substance of Mr. Schreiner's presentation, but soon after that presentation, the Gerhardts formed CRATs with Mr. Schreiner's involvement.[5]

Although they are broadly similar, we describe the facts for each petitioner below. For clarity, we refer to individual petitioners by their first names.

---

[3] The parties have filed Stipulations of Settled Issues in each case making concessions with respect to other issues, which we do not discuss further in this Opinion.

[4] For ease of analysis and readability, our Opinion proceeds in four parts. Part I addresses the issue common to each of the consolidated cases. Part II addresses two issues related to Docket No. 11129-20. Part III addresses an issue related to Docket No. 11146-20. Part IV sets out our conclusion. Within each Part (other than Part IV), we first provide the relevant factual background and then discuss the applicable legal rules.

The parties submitted these cases fully stipulated under Rule 122. The facts set out in the background sections below are based on the pleadings and the parties' Stipulations of Facts as amended once, including the Exhibits attached thereto. The Stipulations of Facts (as amended) with accompanying Exhibits are incorporated herein by this reference.

Gladys, Alan, Audrey, Jack, and Shelley Gerhardt were residents of Minnesota when they timely filed their Petitions in these cases. Tim and Pamela Gerhardt were residents of Illinois.

[5] We note only for context that both Mr. Eickoff and Mr. Schreiner also were involved in the formation of the CRATs in *Furrer*. *See* Stipulation of Facts ¶¶ 9(a), 10(a), 13(a), 14(a), 15(a), 16(a), 17(a), 18(a), 19(a), 22–25, *Furrer v. Commissioner*, T.C. Memo. 2022-100 (No. 7633-19).

B.    *Gladys Gerhardt*[6]

The Albert and Gladys CRAT was created on November 2, 2015. Albert and Gladys were the CRAT's grantors and noncharitable beneficiaries.    The CRAT instrument listed five organizations as charitable remaindermen.    Gray, Lawrence & Jenkins, LLC, was the CRAT's trustee.

Relevant here, the CRAT instrument required the trustee to pay to the beneficiaries for a five-year period an "Annuity Amount" "equal to the greater of: (1) ten percent of the initial net fair market value of all property transferred to [the CRAT] . . . or (2) the payments received . . . from one . . . or more Single Premium Immediate Annuities [(SPIAs)] purchased by the Trustee." Stipulation of Facts Ex. 13–J, at 23.

The CRAT instrument listed Albert and Gladys Gerhardt as the beneficiaries of the Annuity Amount.  But the CRAT instrument also provided that "[n]either the Recipients nor the Recipients' Children shall have any right title, interest, or incident of ownership in or to any [SPIA] transferred to or purchased by the Trustee." *Id.* at 22.  The CRAT instrument defined the term "Recipients" as those "entitled to receive the current annuity payment" and identified Albert and Gladys as the Recipients. *Id.* at 15.

Albert and Gladys contributed real estate to the Albert and Gladys CRAT on November 10, 2015.  The Albert and Gladys CRAT filed Form 5227, Split-Interest Trust Information Return, for the 2015 tax year reporting the total fair market value of the contributed properties as $1,808,000.  With Mr. Schreiner's assistance, Gladys filed Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, with her and Albert's 2015 income tax return, reporting total adjusted basis of $97,517 in the contributed properties.  In December 2015 and March 2016, the trustee of the Albert and Gladys CRAT sold the properties for at least $1,658,000.[7]

---

[6] Gladys engaged in the transactions described here and filed joint federal income tax returns with her husband, Albert, who is now deceased.

[7] The parties' stipulations regarding the total sales price are inconsistent.  One stipulation reflects total proceeds of $1,808,000, First Am. First Stipulation of Facts ¶ 32(e); another lists total proceeds of $1,658,000, *id.* ¶ 41.  The discrepancy of $150,000 appears to be attributable to the fact that the Albert and Gladys CRAT owned only 50% of one of the properties it sold and thus received only 50% of the proceeds for that property.  The discrepancy does not affect the result for the years before us.

Using the proceeds from the sales, the Albert and Gladys CRAT purchased a SPIA from Symetra Life Insurance Co. (Symetra) for $1,537,822 on March 7, 2016. The SPIA contract identified the Albert and Gladys CRAT as the "Owner" of the SPIA, but listed Albert as the annuitant and Gladys as the joint annuitant.[8] Under the SPIA contract, Symetra was required to pay an annuity of $311,708 to Albert and Gladys beginning on April 6, 2016, and on each April 6 thereafter until five total payments were made.

Albert and Gladys received an annuity payment of $311,708 ($155,854 each) in each of 2016 and 2017. For 2016 and 2017, the Albert and Gladys CRAT reported these annuity payments as CRAT distributions to Albert and Gladys on Form 5227:

| Recipient | Distributions | 2016 | 2017 |
|---|---|---|---|
| Albert Gerhardt | Ordinary Income | $2,026 | $2,026 |
| | Corpus | 153,828 | 153,828 |
| Gladys Gerhardt | Ordinary Income | 2,026 | 2,026 |
| | Corpus | 153,828 | 153,828 |

The Albert and Gladys CRAT issued Schedules K–1 (Form 1041), Beneficiary's Share of Income, Deductions, Credits, etc., to both Albert and Gladys for 2016 and 2017. For each year, the Schedules K–1 reported interest income of $2,026 paid to each of Albert and Gladys. The Schedules K–1 reported no other income.

Albert and Gladys jointly filed their federal income tax returns for the 2016 and 2017 tax years. Damon T. Eisma of Eisma & Eisma Attorneys at Law prepared the returns. On these returns, Albert and Gladys reported the interest income reported to them by the Albert and Gladys CRAT. They did not report the remaining payments from the CRAT-funded annuity on either the 2016 or the 2017 tax return.

On Forms 5227, the Albert and Gladys CRAT reported its assets at the end of 2015 to 2017 as follows:

---

[8] The SPIA contract defined the term "Annuitant" in relevant part as "the natural person intended to receive payments under this Contract." The SPIA contract also provided that "[t]here may be a joint Annuitant." Stipulation of Facts Ex. 38–J, at 3.

|  | *2015* | *2016* | *2017* |
|---|---|---|---|
| Trust Principal or Corpus | $1,774,271 | $1,410,953 | $1,103,298 |
| Undistributed Income | – | – | – |
| Undistributed Capital Gains | – | – | – |
| Undistributed Nontaxable Income | – | – | – |

The Commissioner examined Albert and Gladys's 2016 and 2017 tax returns as well as the Albert and Gladys CRAT trust accounting and reporting for those years. During the examination, the Commissioner determined that the Albert and Gladys CRAT trust accounting was inaccurate and adjusted it in relevant part as follows:

| *CRAT Trust Accounting According to IRS Examination* | | | |
|---|---|---|---|
| | *2015* | *2016* | *2017* |
| Prior Year Accumulated Ordinary Income | -0- | -0- | $1,159,807 |
| Ordinary Income: Interest Income | -0- | $4,052 | 4,052 |
| Capital Gain or Loss: Form 4797 | -0-[9] | 1,467,462[10] | -0- |
| Current Net Ordinary Income Before Distributions | -0- | 1,471,514[11] | 4,052 |
| Total Distributable Income (Cumulative) | -0- | 1,471,514 | 1,163,859 |
| Distributions to Noncharitable Beneficiaries | -0- | 311,707 | 311,707 |
| Undistributed Ordinary Income | -0- | 1,159,807 | 852,152 |

The Commissioner also determined that the income the Albert and Gladys CRAT realized on sales of the contributed properties was ordinary income under section 1245. Thus, according to the Commissioner, all the payments Albert and Gladys received in 2016 and 2017 from the CRAT-funded annuity were ordinary income to them under section 664(b).

The Commissioner issued Albert and Gladys a notice of deficiency for 2016 and 2017. Among other items not relevant here, the Commissioner increased Albert and Gladys's gross income by $307,656 for each of 2016 and 2017 to reflect the adjustments to their ordinary income from the CRAT-funded annuity payments.

---

[9] The record reflects that the Albert and Gladys CRAT sold some of the contributed property in 2015 rather than 2016. So, it would appear that some of the gain and income included in the chart for 2016 should have been included for 2015 instead. But, because the CRAT made no distributions in 2015, this possible error does not affect its total distributable income (cumulative) for 2016 and 2017.

[10] The parties stipulate that the Commissioner determined that the Albert and Gladys CRAT sold the real estate contributed by Albert and Gladys for $1,658,000 and that it had a cumulative adjusted basis in the properties of $190,538. *See supra* note 7. In view of these amounts, the Albert and Gladys CRAT realized gain of $1,467,462 from the sale of the real estate. Relying on section 1245, the Commissioner further determined that the gain should be treated as ordinary income.

[11] The "Current Net Ordinary Income Before Distributions" amount consists of interest income of $4,052 and capital gain treated as ordinary income under section 1245 of $1,467,462.

C.    *Alan and Audrey Gerhardt*

The Alan and Audrey CRAT was created on November 10, 2015. Alan and Audrey were the CRAT's grantors and noncharitable beneficiaries.  The CRAT instrument listed one organization as a charitable remainderman.  Gray, Lawrence & Jenkins, LLC, was the CRAT's trustee.

The terms of the Alan and Audrey CRAT instrument are similar to those discussed in the previous section, *see* Part I.B above, so we will not repeat them here.[12]  The CRAT instrument identified Alan and Audrey as the beneficiaries and recipients of the Annuity Amount required to be paid out by the trustee.

Alan and Audrey contributed real estate to the Alan and Audrey CRAT on November 10, 2015.  The Alan and Audrey CRAT filed Form 5227 for the 2015 tax year reporting the total fair market value of the contributed properties as $1,222,000.  With Mr. Schreiner's assistance, Alan and Audrey filed Forms 709 with their 2015 income tax return, each reporting total adjusted basis of $42,079 in the contributed properties.  In March 2016, the CRAT's trustee sold the properties for $1,222,000.

Using the proceeds from the sale of the properties, the Alan and Audrey CRAT purchased a SPIA from Symetra for $1,022,618 on March 22, 2016.  The SPIA contract identified the Alan and Audrey CRAT as the "Owner" of the SPIA, but listed Alan as the annuitant and Audrey as the joint annuitant.[13]  Under the SPIA contract, Symetra was required to pay an annuity of $207,232 to Alan and Audrey beginning on April 6, 2016, and on each April 6 thereafter until five total payments were made.

Alan and Audrey received an annuity payment of $207,232 ($103,616 each) in each of 2016 and 2017.  For 2016 and 2017, the Alan and Audrey CRAT reported these annuity payments as CRAT distributions to Alan and Audrey on Form 5227:

---

[12] The same applies to the CRAT instruments for the remaining CRATs.

[13] The SPIA contract defined the term "annuitant" in the same way as the Albert and Gladys CRAT SPIA contract and also provided for the possibility of a joint annuitant.  *See supra* note 8.

| Recipient | Distributions | 2016 | 2017 |
|---|---|---|---|
| Alan Gerhardt | Ordinary Income | $1,347 | $1,347 |
| | Corpus | 102,269 | 102,269 |
| Audrey Gerhardt | Ordinary Income | 1,347 | 1,347 |
| | Corpus | 102,269 | 102,269 |

The Alan and Audrey CRAT issued Schedules K–1 to both Alan and Audrey for 2016 and 2017. For each year, the Schedules K–1 reported interest income of $1,347 paid to each of Alan and Audrey. The Schedules K–1 reported no other income.

Alan and Audrey jointly filed their federal income tax returns for the 2016 and 2017 tax years. Damon T. Eisma of Eisma & Eisma Attorneys at Law prepared the returns. On these returns, Alan and Audrey reported the interest income reported to them by the Alan and Audrey CRAT. They did not report the remaining payments from the CRAT-funded annuity on either the 2016 or the 2017 tax return.

On Forms 5227, the Alan and Audrey CRAT reported its assets at the end of 2015 to 2017 as follows:

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| Trust Principal or Corpus | $1,200,685 | $818,080 | $613,542 |
| Undistributed Income | – | – | – |
| Undistributed Capital Gains | – | – | – |
| Undistributed Nontaxable Income | – | – | – |

The Commissioner examined Alan and Audrey's 2016 and 2017 tax returns as well as the Alan and Audrey CRAT trust accounting and reporting for those years. During the examination, the Commissioner determined that the Alan and Audrey CRAT trust accounting was inaccurate and adjusted it in relevant part as follows:

| CRAT Trust Accounting According to IRS Examination | | | |
|---|---|---|---|
| | *2015* | *2016* | *2017* |
| Prior Year Accumulated Ordinary Income | -0- | -0- | $904,201 |
| Ordinary Income: Interest Income | -0- | $2,694 | 2,694 |
| Capital Gain or Loss: Form 4797 | -0- | 1,108,739[14] | -0- |
| Current Net Ordinary Income Before Distributions | -0- | 1,111,433[15] | 2,694 |
| Total Distributable Income (Cumulative) | -0- | 1,111,433 | 906,895 |
| Distributions to Noncharitable Beneficiaries | -0- | 207,232 | 207,232 |
| Undistributed Ordinary Income | -0- | 904,201 | 699,663 |

The Commissioner also determined that the income the Alan and Audrey CRAT realized on sale of the contributed properties was ordinary income under section 1245. Thus, according to the Commissioner, all the payments Alan and Audrey received in 2016 and 2017 from the CRAT-funded annuity were ordinary income to them.

The Commissioner issued Alan and Audrey a notice of deficiency for 2016 and 2017. Among other items not relevant here, the Commissioner increased Alan and Audrey's gross income by $204,538 for each of 2016 and 2017 to reflect the adjustments to their ordinary income from the CRAT-funded annuity payments.

D. *Jack and Shelley Gerhardt*

Jack and Shelley created two CRATs, Jack and Shelley CRAT I and Jack and Shelley CRAT II, on November 10, 2015, and February 17, 2016, respectively. Jack and Shelley were the grantors and noncharitable beneficiaries of the CRATs. The CRAT instruments also

---

[14] The parties stipulate that the Commissioner determined that the Alan and Audrey CRAT sold the properties contributed by Alan and Audrey for $1,222,000 and that it had a cumulative basis in the properties of $113,261. In view of these amounts, the Alan and Audrey CRAT realized income of $1,108,739 from the sale of the properties.

[15] The "Current Net Ordinary Income Before Distributions" amount consists of interest income of $2,694 and capital gain treated as ordinary income under section 1245 of $1,108,739.

listed Jack and Shelley as the beneficiaries and recipients of the Annuity Amount required to be paid by trustee. The Jack and Shelley CRAT I instrument listed two organizations as charitable remaindermen, and the Jack and Shelley CRAT II instrument listed four organizations as charitable remaindermen. Gray, Lawrence & Jenkins, LLC, was the trustee of both CRATs.

Jack and Shelley contributed real estate to Jack and Shelley CRAT I in November 2015 and to Jack and Shelley CRAT II in May 2016. Each CRAT filed Form 5227 in the year of its creation, reporting the fair market values of the contributed properties at the time of contribution. Jack and Shelley CRAT I reported the total fair market value of the contributed properties it held as $1,530,000. Jack and Shelley CRAT II reported the fair market value of the contributed property it held as $440,550. With Mr. Schreiner's assistance, Jack and Shelley each filed Forms 709 with their 2015 and 2016 income tax returns reporting their contributions to Jack and Shelly CRAT I and Jack and Shelley CRAT II. Jack and Shelley each reported total adjusted basis of $62,548 in the properties contributed to Jack and Shelly CRAT I and adjusted basis of $72,359 in the property contributed to Jack and Shelley CRAT II.

In March 2016, Jack and Shelley CRAT I sold the contributed properties it held for $1,455,000. Later in 2016, Jack and Shelley CRAT II sold the contributed property it held for $440,550.

Both CRATs used proceeds from the sales of the contributed properties to purchase SPIAs from Symetra. Jack and Shelly CRAT I purchased a SPIA for $1,287,283. The SPIA contract identified the CRAT as "Owner" of the SPIA, but listed Jack as the annuitant and Shelley as the joint annuitant. *See supra* note 13. Under the SPIA contract, Symetra was required to pay an annuity to Jack and Shelley of $260,902, beginning on April 6, 2016, and each April 6 thereafter until five payments were made.

Jack and Shelley CRAT II purchased a SPIA for $367,302. The complete SPIA contract is not in the record, but the parties stipulated that Jack was listed as the annuitant of the SPIA, and Shelley was the joint annuitant. Under the SPIA contract, Symetra was required to pay

an annuity to Jack and Shelley of $73,678, beginning in July 2016 and each July[16] thereafter until five payments were made.

Jack and Shelley received an annuity payment of $260,902 ($130,451 each) from the SPIA purchased by Jack and Shelley CRAT I and an annuity payment of $73,678 ($36,839 each) from the SPIA purchased by Jack and Shelley CRAT II in 2016 and 2017. For each year, Jack and Shelley CRAT I reported the annuity payments as CRAT distributions to Jack and Shelley on Form 5227:

| Recipient | Distributions | 2016 | 2017 |
|---|---|---|---|
| Jack Gerhardt | Ordinary Income | $1,696 | $1,696 |
| | Corpus | 128,755 | 128,755 |
| Shelley Gerhardt | Ordinary Income | 1,696 | 1,696 |
| | Corpus | 128,755 | 128,755 |

Similarly, Jack and Shelley CRAT II filed Forms 5227 with the Commissioner reporting the annuity payments as CRAT distributions to Jack and Shelley as follows:

| Recipient | Distributions | 2016 | 2017 |
|---|---|---|---|
| Jack Gerhardt | Ordinary Income | $111 | $111 |
| | Corpus | 36,729 | 36,729 |
| Shelley Gerhardt | Ordinary Income | 110 | 110 |
| | Corpus | 36,728 | 36,728 |

In addition to filing the Forms 5227, each CRAT issued to Jack and Shelley Schedules K–1 for 2016 and 2017. The Schedules K–1 reported total interest income paid to Jack and Shelley equal to the total interest income listed on the Forms 5227. The Schedules K–1 reported no other income to Jack and Shelley.

---

[16] The parties have stipulated that the annuity payments were to begin in June 2016 and continue in June of each following year until five payments were made. Our review of the record shows that the SPIA contract for Jack and Shelley CRAT II required Symetra to make the payments beginning in July 2016 and in July of each following year until five payments were made, and we so find. *See Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989) (holding that we are not obliged to accept a stipulation between the parties when it is clearly contrary to facts disclosed by the record).

Jack and Shelley jointly filed federal income tax returns for the 2016 and 2017 tax years. Damon T. Eisma of Eisma & Eisma Attorneys at Law prepared the returns. On these returns, Jack and Shelley reported the interest income reported to them by the CRATs on the Schedules K–1. They did not report the remaining payments from the CRAT-funded annuities on the 2016 or the 2017 return.

On Forms 5227, Jack and Shelley CRAT I reported its assets at the end of 2015 to 2017 as follows:

|  | *2015* | *2016* | *2017* |
|---|---|---|---|
| Trust Principal or Corpus | $1,530,000 | $1,182,759 | $925,248 |
| Undistributed Income | – | – | – |
| Undistributed Capital Gains | – | – | – |
| Undistributed Nontaxable Income | – | – | – |

On Forms 5227, Jack and Shelley CRAT II reported its assets at the end of 2016 and 2017 as follows:

|  | *2016* | *2017* |
|---|---|---|
| Trust Principal or Corpus | $298,938 | $220,388 |
| Undistributed Income | – | – |
| Undistributed Capital Gains | – | – |
| Undistributed Nontaxable Income | – | – |

The Commissioner examined Jack and Shelley's 2016 and 2017 tax returns as well as the CRATs' trust accounting and reporting for those years. During the examination, the Commissioner determined that the Jack and Shelley CRAT I trust accounting was inaccurate and adjusted it as follows:

| CRAT Trust Accounting According to IRS Examination | | | |
|---|---|---|---|
| | *2015* | *2016* | *2017* |
| Prior Year Accumulated Ordinary Income | -0- | -0- | $1,052,385 |
| Ordinary Income: Interest Income | -0- | $3,392 | 3,392 |
| Capital Gain or Loss: Form 4797 | -0- | 1,309,085[17] | -0- |
| Current Net Ordinary Income Before Distributions | -0- | 1,312,477[18] | 3,392 |
| Total Distributable Income (Cumulative) | -0- | 1,312,477 | 1,055,777 |
| Distributions to Noncharitable Beneficiaries | -0- | 260,902 | 260,092 |
| Undistributed Ordinary Income | -0- | 1,052,385 | 795,685 |

The Commissioner also adjusted the Jack and Shelley CRAT II accounting as follows:

---

[17] The parties stipulate that the Commissioner determined that Jack and Shelley CRAT I sold the properties contributed by Jack and Shelley for $1,455,000 and that it had a cumulative basis in the properties of $145,915. In view of these amounts, Jack and Shelley CRAT I realized income of $1,309,085 from the sale of the properties.

[18] The "Current Net Ordinary Income Before Distributions" amount consists of interest income of $3,392 and capital gain treated as ordinary income under section 1245 of $1,309,085.

| CRAT Trust Accounting According to IRS Examination | | |
|---|---|---|
| | *2016* | *2017* |
| Prior Year Accumulated Ordinary Income | -0- | $366,872 |
| Ordinary Income: Interest Income | -0-[19] | -0- |
| Capital Gain or Loss: Form 4797 | $440,550[20] | -0- |
| Current Net Ordinary Income Before Distributions | 440,550[21] | -0- |
| Total Distributable Income (Cumulative) | 440,550 | 366,872 |
| Distributions to Noncharitable Beneficiaries | 73,678 | 73,678 |
| Undistributed Ordinary Income | 366,872 | 293,194 |

The Commissioner also determined that the income Jack and Shelley CRAT I and Jack and Shelley CRAT II realized on sales of the contributed properties was ordinary income under section 1245. Thus, according to the Commissioner, all the payments Jack and Shelley received in 2016 and 2017 from the CRAT-funded annuities were ordinary income to them.

The Commissioner issued Jack and Shelley a notice of deficiency for 2016 and 2017. Among other items, the Commissioner increased Jack and Shelley's gross income by $330,967 for each of 2016 and 2017 to reflect the adjustments to their ordinary income from the CRAT-funded annuity payments.

### E. *Tim and Pamela Gerhardt*

Tim and Pamela Gerhardt created two CRATs, Tim and Pamela CRAT I and Tim and Pamela CRAT II, on November 10, 2015, and

---

[19] We do not readily see why the Commissioner's trust accounting omits interest income of $221 reported by Jack and Shelley CRAT II on its Forms 5227 for 2016 and 2017. But this omission does not affect our analysis for the years before us.

[20] The parties stipulate that the Commissioner determined that Jack and Shelley CRAT II sold the property contributed by Jack and Shelley for $440,550 and that it did not have any basis in the property. In view of these amounts, Jack and Shelley CRAT II realized income of $440,550 from the sale of the property.

[21] The "Current Net Ordinary Income Before Distributions" consists solely of capital gain treated as ordinary income under section 1245 of $440,550.

January 21, 2016, respectively. Tim and Pamela were the grantors and noncharitable beneficiaries of the CRATs. The CRAT instruments also listed Tim and Pamela as the beneficiaries and recipients of Annuity Amount required to be paid by the trustee. The Tim and Pamela CRAT I instrument and the Tim and Pamela CRAT II instrument listed six organizations each as charitable remaindermen. Gray, Lawrence & Jenkins, LLC, was the trustee of both CRATs.

Tim and Pamela contributed real estate to Tim and Pamela CRAT I in November 2015 and to Tim and Pamela CRAT II in February 2016. Each CRAT filed Form 5227 in the year of its creation, reporting the fair market values of the contributed properties at the time of the respective contributions. Tim and Pamela CRAT I reported the fair market value of the contributed property it held as $310,000. Tim and Pamela CRAT II reported the fair market value of the contributed property it held as $549,450. With Mr. Schreiner's assistance, Tim and Pamela filed Forms 709 with the Commissioner reporting the contributions to Tim and Pamela CRAT I and Tim and Pamela CRAT II. Tim and Pamela reported no adjusted basis in the property contributed to Tim and Pamela CRAT I. They reported an adjusted basis of $90,245 in the property contributed to Tim and Pamela CRAT II.

In December 2015, Tim and Pamela CRAT I sold the contributed property it held for $310,000. In May 2016, Tim and Pamela CRAT II sold the contributed property it held for $549,450.

Both CRATs used proceeds from the sales of the contributed properties to purchase a SPIA from Symetra. Tim and Pamela CRAT I purchased a SPIA for $252,158. The SPIA contract identified the "Tim Leroy and Pamela Holck Gerhardt [CRAT]" as the SPIA's "Owner." Tim was listed as the annuitant and Pamela as the joint annuitant. *See supra* note 13. Under the SPIA contract, Symetra was required to pay an annuity to Tim and Pamela of $50,967, beginning on March 1, 2016, and on March 1 of each year thereafter until five payments were made.

Tim and Pamela CRAT II purchased a SPIA for $456,410. The record does not include a copy of the SPIA contract for Tim and Pamela CRAT II, but the parties stipulated that Tim was the annuitant and Pamela was the joint annuitant. Under the SPIA contract, Symetra was required to pay an annuity to Tim and Pamela of $92,204, beginning on June 1, 2016, and on June 1 of each year thereafter until five payments were made.

Tim and Pamela received an annuity payment of $50,967 from Tim and Pamela CRAT I and an annuity payment of $92,205[22] from Tim and Pamela CRAT II in 2016 and 2017. For each year, Tim and Pamela CRAT I reported the annuity payments as CRAT distributions to Jack and Shelley on Form 5227:

| Recipient | Distributions | 2016 | 2017 |
|---|---|---|---|
| Tim Gerhardt | Ordinary Income | $255 | $255 |
| | Corpus | 25,229 | 25,229 |
| Pamela Gerhardt | Ordinary Income | 255 | 255 |
| | Corpus | 25,228 | 25,228 |

Similarly, Tim and Pamela CRAT II reported the annuity payments as CRAT distributions to Tim and Pamela on Form 5227:

| Recipient | Distributions | 2016 | 2017 |
|---|---|---|---|
| Tim Gerhardt | Ordinary Income | $139 | $139 |
| | Corpus | 45,964 | 45,964 |
| Pamela Gerhardt | Ordinary Income | 138 | 138 |
| | Corpus[23] | 45,964 | 45,964 |

In addition to filing the Forms 5227, each CRAT issued to Tim and Pamela Schedules K–1 for 2016 and 2017. The Schedules K–1 reported total interest income paid to Tim and Pamela equal to the total interest income listed on the Forms 5227. The Schedules K–1 reported no other income to Tim and Pamela.

Tim and Pamela jointly filed federal income tax returns for the 2016 and 2017 tax years. Anthony J. Baldassano prepared the returns. Tim and Pamela reported the interest income reported to them by the

---

[22] The Stipulation of Facts filed by the parties is inconsistent as to the annual amounts paid to Tim and Pamela by the Tim and Pamela CRAT I-funded annuity and the Tim and Pamela CRAT II-funded annuity. Based on our review of the record, we find that the correct number for the Tim and Pamela CRAT I-funded annuity is $50,967 and the correct number for the Tim and Pamela CRAT II-funded annuity is $92,205.

[23] The parties stipulated that the corpus distributions to Pamela were reported on Forms 5227 as $46,964 for both 2016 and 2017, due perhaps to what appears to be a scrivener's error in the 2016 Form 5227. Based on our review of the record, we find the correct amount is $45,964.

CRATs on the Schedules K–1. They did not report the remaining payments from the CRAT-funded annuities on the 2016 or the 2017 return.

On Forms 5227, Tim and Pamela CRAT I reported its assets at the end of 2015 to 2017 as follows:

|  | *2015* | *2016* | *2017* |
| --- | --- | --- | --- |
| Trust Principal or Corpus | $288,685 | $201,728 | $151,271 |
| Undistributed Income | – | – | – |
| Undistributed Capital Gains | – | – | – |
| Undistributed Nontaxable Income | – | – | – |

On Forms 5227, Tim and Pamela CRAT II reported its assets at the end of 2016 and 2017 as follows:

|  | *2016* | *2017* |
| --- | --- | --- |
| Trust Principal or Corpus | $372,652 | $275,631 |
| Undistributed Income | – | – |
| Undistributed Capital Gains | – | – |
| Undistributed Nontaxable Income | – | – |

The Commissioner examined Tim and Pamela's 2016 and 2017 tax year returns as well as the CRATs' trust accounting and reporting for those years. During the examination, the Commissioner determined that the Tim and Pamela CRAT I trust accounting was inaccurate and adjusted it as follows:

| CRAT Trust Accounting According to IRS Examination | | | |
|---|---|---|---|
| | *2015* | *2016* | *2017* |
| Prior Year Accumulated Ordinary Income | -0- | -0- | $238,228 |
| Ordinary Income: Interest Income | -0- | $510 | 510 |
| Capital Gain or Loss: Form 4797 | -0- | 288,685[24] | -0- |
| Current Net Ordinary Income Before Distributions | -0- | 289,195[25] | 510 |
| Total Distributable Income (Cumulative) | -0- | 289,195 | 238,738 |
| Distributions to Noncharitable Beneficiaries | -0- | 50,967 | 50,967 |
| Undistributed Ordinary Income | -0- | 238,228 | 187,771 |

The Commissioner also adjusted the Tim and Pamela CRAT II accounting as follows:

---

[24] The parties stipulate that the Commissioner determined that Tim and Pamela CRAT I sold the property contributed by Tim and Pamela for $310,000 and that it had a cumulative basis in the property of $21,315. In view of these amounts, Tim and Pamela CRAT I realized income of $288,685 from the sale of the property.

[25] The "Current Net Ordinary Income Before Distributions" amount consists of interest income of $510 and capital gain treated as ordinary income under section 1245 of $288,685.

| CRAT Trust Accounting According to IRS Examination | | |
|---|---|---|
| | *2016* | *2017* |
| Prior Year Accumulated Ordinary Income | -0- | $457,246 |
| Ordinary Income: Interest Income | -0- | -0- |
| Capital Gain or Loss: Form 4797 | $549,450[26] | -0- |
| Current Net Ordinary Income Before Distributions | 549,450[27] | -0- |
| Total Distributable Income (Cumulative) | 549,450 | 457,246 |
| Distributions to Noncharitable Beneficiaries[28] | 92,204 | 92,204 |
| Undistributed Ordinary Income | 457,246 | 365,042 |

The Commissioner also determined that the income Tim and Pamela CRAT I and Tim and Pamela CRAT II realized on sales of the contributed properties was ordinary income under section 1245. Thus, according to the Commissioner, all the payments Tim and Pamela received in 2016 and 2017 from the CRAT-funded annuities were ordinary income to them.

The Commissioner issued Tim and Pamela a notice of deficiency for 2016 and 2017. Among other items, the Commissioner increased Tim and Pamela's gross income by $142,385 for each of 2016 and 2017 to reflect the adjustments to their ordinary income from the CRAT-funded annuity payments.

---

[26] The parties stipulate that the Commissioner determined that Tim and Pamela CRAT II sold the property contributed by Tim and Pamela for $549,450 and that it did not have any basis in the property. In view of these amounts, Tim and Pamela CRAT II realized income of $549,450 from the sale of the property.

[27] The "Current Net Ordinary Income Before Distributions" consists solely of capital gain treated as ordinary income under section 1245 of $549,450.

[28] As described above, we find that the amount of the annuity distributions was actually $92,205 for each year.

*Discussion*

F.  *General Background*

A CRAT is a type of a charitable remainder trust.  I.R.C. § 664. "[A] staple among estate planners," a charitable remainder trust is often a vehicle used by "individuals with substantial appreciated capital gain property, a charitable intent, and a need for a stream of income during their lifetimes."  Richard Fox, *Charitable Giving: Taxation, Planning, and Strategies* ¶ 25.01 (2023), Westlaw WGL-CHARGIV (footnotes omitted).  "The basic concept of a [CRAT] involves a [grantor's] transfer of property to an irrevocable trust, the terms of which provide for the payment of a specified amount, at least annually, to the grantor or other designated noncharitable beneficiaries for life or another predetermined period of time up to twenty years."  *Id.* (footnotes omitted); *see also* I.R.C. § 664(d).  What remains in the trust after the expiration of that period (which cannot be less than "10 percent of the initial net fair market value of all property placed in the trust," I.R.C. § 664(d)(1)(D)) "must be transferred to one or more qualified charitable organizations or continue to be held in the trust for the benefit of such organizations."  Fox, *supra*, ¶ 25.01.  In short, unlike an immediate gift to charity, a contribution to a CRAT "blends the philanthropic intentions of a donor with his or her financial needs or the financial needs of others."  *Id.*

As a rule, the grantor recognizes no gain when transferring appreciated property to a CRAT.  *See Buehner v. Commissioner*, 65 T.C. 723, 740 (1976) ("A gift of appreciated property [to a CRAT] does not result in income to the donor . . . ." (quoting *Humacid Co. v. Commissioner*, 42 T.C. 894, 913 (1964))); *see also Furrer*, T.C. Memo. 2022-100, at *8–9 (discussing treatment of CRATs).[29]  Moreover, because CRATs are exempt from income tax, a CRAT can sell appreciated property without itself paying tax on the sale.  *See* I.R.C. § 664(c)(1); Treas. Reg. § 1.664-1(a)(1)(i); Fox, *supra*, ¶ 25.01.

But that does not mean that the grantor or other noncharitable CRAT beneficiaries do not have to pay tax with respect to distributions from the CRAT.  "Although a [CRAT] is itself exempt from income tax and, therefore, pays no tax on any of its taxable income, the annuity . . . payments made to the noncharitable beneficiaries carry out taxable

---

[29] In addition, the grantor may be entitled to a charitable contribution deduction equal to the present value of the remainder interest at the time of the transfer to the CRAT.  *See* I.R.C. § 170(f)(2)(A); Treas. Reg. § 1.170A-6(b).

income that is subject to tax at the beneficiary level." Fox, *supra*, ¶ 25.50 (footnote omitted); *see also Alpha I, L.P. v. United States*, 682 F.3d 1009, 1015 (Fed. Cir. 2012) (stating the rule and citing section 664(b) and (c)(1)). This is so because when property is transferred to a CRAT, the basis of the property in the CRAT's hands generally is the same as it would be in the hands of the grantor. *See* I.R.C. § 1015(a) and (b); Treas. Reg. §§ 1.1015-1(a)(1), 1.1015-2(a)(1). And when the CRAT sells the property, it realizes gain to the extent the amount realized from the sale exceeds its adjusted basis. I.R.C. § 1001; *see also* Treas. Reg. § 1.664-1(d)(1)(i) (discussing the assignment of income to categories at the CRAT level). Although not taxable to the CRAT, that gain must be tracked and affects the treatment of distributions from the CRAT.[30] *See, e.g.*, Treas. Reg. § 1.664-1(d)(1)(viii) (providing examples illustrating the rules).

Congress has established specific ordering rules that govern the characterization and reporting of annuity amounts distributed by a CRAT to its income beneficiaries. *See* I.R.C. § 664(b). Under this regime, distributions from a CRAT to income beneficiaries are deemed to have the following character and to be distributed in the following order:

(1)     as ordinary income, to the extent of the CRAT's current and previously undistributed ordinary income;

(2)     as capital gain, to the extent of the CRAT's current and previously undistributed capital gain;

(3)     as other income, to the extent of the CRAT's current and previously undistributed other income; and

(4)     as a nontaxable distribution of trust corpus.

---

[30] The tax treatment set out in the text sometimes leads commentators describing the benefits of a CRAT to say that "[a]ppreciated assets held by an individual can be disposed of on a tax-free basis." Fox, *supra*, ¶ 25.02. But, as we have explained, and as the same commentators recognize, that is not quite right: "Although assets may be sold on a tax-free basis by a [CRAT], because distributions from the trust to noncharitable beneficiaries are subject to tax, a more accurate statement might be that a [CRAT] defers the payment of income tax [until noncharitable beneficiaries receive distributions from the CRAT]." *Id.* n.24.

I.R.C. § 664(b)(1)–(4); Fox, *supra,* ¶ 25.50.[31]

CRATs are subject to strict reporting requirements to ensure compliance with the statutory ordering rules. *See* I.R.C. § 4947(a); Treas. Reg. § 1.664-1(a)(1)(ii). A CRAT must file an annual information return on Form 5227 reflecting its income, deductions, accumulations, and distributions for the year. *See* I.R.C. § 6011(a); Treas. Reg. § 53.6011-1(d). And it must issue to each income beneficiary a Schedule K–1 properly describing the tax character of all distributions. *See* I.R.C. § 6034A(a); Treas. Reg. § 1.6034-1(a).

G. *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The parties have stipulated that the Gerhardts received the payments from the CRAT-funded annuities at issue, and the Gerhardts do not otherwise argue that the burden is on the Commissioner to connect the Gerhardts with the income. *See Pittman v. Commissioner*, 100 F.3d 1308, 1313 (7th Cir. 1996), *aff'g* T.C. Memo. 1995-243; *Page v. Commissioner*, 58 F.3d 1342, 1347 (8th Cir. 1995), *aff'g* T.C. Memo. 1993-398; *Day v. Commissioner*, 975 F.2d 534, 537 (8th Cir. 1992), *aff'g in part, rev'g in part on other grounds, and remanding* T.C. Memo. 1991-140. Instead, the issue before us is whether those payments are taxable to the Gerhardts. As to the annuity payments, the Gerhardts have not alleged, and the evidence does not establish, that the burden of proof as to any factual issues before us has shifted to the Commissioner under section 7491(a). Accordingly, the burden remains with the Gerhardts to prove the Commissioner's determinations are erroneous.

H. *Application to the Gerhardts*

As we have already discussed, distributions from a CRAT typically are taxable in the hands of noncharitable beneficiaries to the extent of the CRAT's income. *See* I.R.C. § 664(b). Each of the CRATs here received appreciated property from the Gerhardts. The Gerhardts did not recognize gain on the transfers to the CRATs, and the CRATs have the same bases in the properties as the Gerhardts did before the

---

[31] *See also Miller v. Commissioner*, T.C. Memo. 2009-182, 2009 WL 2432375.

contributions.[32]  *See* I.R.C. § 1015(a) and (b); *Veterans Found. v. Commissioner*, 38 T.C. 66, 72 (1962), *aff'd*, 317 F.2d 456 (10th Cir. 1963); Treas. Reg. §§ 1.1015-1(a)(1), 1.1015-2(a)(1).[33]  After receiving the properties, the CRATs sold them and used the proceeds to purchase SPIAs.  The Gerhardts then received annual distributions from the CRATs in the form of annuities paid by the CRAT-funded SPIAs.

The CRATs realized gains on the sales of the contributed properties.  *See* I.R.C. § 1001(a).  Although the CRATs did not have to pay tax on those gains because of section 664(c), under section 664(b), the income they earned was relevant for determining the character of the distributions the Gerhardts received.  *See* Treas. Reg. § 1.664-1(d)(1)(ii)(*a*); *see also Alpha I, L.P.*, 682 F.3d at 1015 ("[T]he income of a CRUT is taxable to its income beneficiaries upon distribution."); Fox, *supra*, ¶ 25.50.[34]

As we have already discussed, the character of CRAT distributions to noncharitable beneficiaries follows the character of the income to the CRAT.  *See* I.R.C. § 664(b).  The distributions are characterized in the following order: (1) ordinary income, (2) capital gains, (3) other income, and (4) trust corpus.  *Id.*  Here, the Commissioner determined that the income the CRATs earned was ordinary income because the properties the CRATs sold were subject to the rules of section 1245—a point not disputed by the Gerhardts.[35]  On

---

[32] The Gerhardts have made no argument that the adjusted bases in the properties increased by reason of section 1015(d)(1) (adjustment to basis for gift tax paid). They have therefore forfeited any argument on that front. We note further that the record does not show that they actually paid gift tax on the contributions to the CRATs.

The Gerhardts also concede on brief that, if they had sold the properties instead of contributing them to the CRATs, they would have taxable gains in the amounts determined by the Commissioner. *See* Pet'rs' Reply to Resp't's Opening Br. 3–9.

[33] *See also Magness v. Commissioner*, T.C. Memo. 1965-260, 1965 Tax Ct. Memo LEXIS 70, *8–9, *9 n.3 (stating the rule and providing background on its adoption).

[34] *See also Miller v. Commissioner*, 2009 WL 2432375, at *2.

[35] The Gerhardts state in their answering brief that the Commissioner's characterization of the gains from the CRATs' sales of the contributed properties was "of little or no consequence." Pet'rs' Reply to Resp't's Opening Br. 20. They are mistaken. This characterization is indeed consequential. But the Gerhardts do not argue that the gains should be characterized in any other way (for example, as capital

the basis of this determination and well-established law, *see* I.R.C. §§ 64, 1245(a), the Gerhardts had ordinary income from the CRATs as follows:

| Ordinary Income from CRATs, Including Interest Income Already Reported by the Gerhardts | | | |
|---|---|---|---|
| *Petitioner* | *CRAT* | *2016* | *2017* |
| Gladys | Albert and Gladys CRAT | $311,708 | $311,708 |
| Alan and Audrey | Alan and Audrey CRAT | 207,232 | 207,232 |
| Jack and Shelley | Jack and Shelley CRAT I | 260,902 | 260,902 |
| | Jack and Shelley CRAT II | 73,678 | 73,678 |
| Tim and Pamela | Tim and Pamela CRAT I | 50,967 | 50,967 |
| | Tim and Pamela CRAT II | 92,205 | 92,205 |

The Gerhardts resist the straightforward analysis set out above. In their telling, the Code does a lot more than exempt the CRATs from paying tax on built-in gains realized when contributed property is sold. According to the Gerhardts, the Code also relieves them from paying tax on the distributions that were made possible by the CRATs' realization of the built-in gains. As they put it, "all taxable gains (on the sale of the asset[s contributed to the CRATs]) *disappear* and the full amount of the proceeds [is] converted to principal to be invested by the CRAT." Pet'rs' Opening Br. 6–7 (emphasis added). In the Gerhardts' view, "[i]t becomes obvious that Congress intended [this treatment] to promote charitable giving while offering large tax benefits as incentives." *Id.* at 7. The gain disappearing act the Gerhardts attribute to the CRATs is worthy of a Penn and Teller magic show. But it finds no support in the Code, regulations, or caselaw.

In *Furrer*, we considered facts and arguments nearly identical to those before us now and reached the same conclusion. We invited the Gerhardts to distinguish *Furrer* and even extended the briefing schedule to allow them to do so. But, tellingly, their briefs fail to mention the case

---

gains). Therefore, they have forfeited the argument. *See, e.g.*, *Smith v. Commissioner*, No. 5191-20, 159 T.C., slip op. at 41 (Aug. 25, 2022); *see also Hackett v. City of S. Bend*, 956 F.3d 504, 509 (7th Cir. 2020); *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) ("Claims not raised in an opening brief are deemed waived.").

at all.[36]  Their silence confirms our view that the reasoning in *Furrer* applies with equal force here.

As best we can tell, the Gerhardts maintain that the bases of assets donated to a CRAT are equal to their fair market values.  *See* Pet'rs' Reply to Resp't's Opening Br. 10–11 ("Utilizing CRATs, the assets are donated to a CRAT and book at the fair market value of the asset at that time.  The donor's basis is a moot point as the controlling fair market value is the price at the time the asset is donated to the CRAT."); *id.* at 13 ("The trustee of the CRAT has no way to know the cost basis of any asset donated to it, nor is it required to obtain such information since that is not required by the Internal Revenue Code.").  Section 1015 flatly contradicts their position.  Section 1015(a) governs transfers by gift, and section 1015(b) governs transfers in trust (other than transfers in trust by gift).  Under either provision, the basis in the property "shall be the same as it would be in the hands of the donor" under section 1015(a) or "in the hands of the grantor" under section 1015(b).[37]  And the Gerhardts' claim that section 1015 does not govern transfers to CRATs because it does not specifically mention them is meritless.  Nothing in the text of the provision excludes CRATs from its scope.

The Gerhardts also seek shelter in the rules governing the taxation of annuities in section 72.  But, if one respects the form of the transactions the Gerhardts chose, the Gerhardts did not buy any annuities from Symetra.  The CRATs did so and directed how payments under the annuities were to be made.[38]  Thus, any amounts paid by

---

[36] This is particularly notable given that the Gerhardts' counsel in these cases also represented the Furrers.  Moreover, neither the Gerhardts' Opening Brief nor their Reply to Respondent's Opening Brief cites a single case in support of their position.  As we have already explained, no such support exists.

[37] The position the Gerhardts advance has not been the law for more than a century.  As Treasury Regulation § 1.1015-3(a) provides: "In the case of property acquired by gift or transfer in trust *before January 1, 1921*, the basis of such property is the fair market value thereof at the time of the gift or at the time of the transfer in trust."  (Emphasis added.)  For property transferred after December 31, 1920, "the basis of the property for the purpose of determining gain is the same as it would be in the hands of the donor."  Treas. Reg. § 1.1015-1(a)(1) (governing "property acquired by gift . . . (whether by transfer in trust or otherwise)"); *see also* Treas. Reg. § 1.1015-2(a)(1) (setting out the same rule for "property acquired . . . by transfer in trust (other than by a transfer in trust by gift, bequest, or device)").

[38] As we have already noted, under the SPIA contracts, the Gerhardts did not have "any right title, interest, or incident of ownership in or to any [SPIA] transferred to or purchased by the Trustee."  Stipulation of Facts Ex. 13–J, at 22.  Symetra appears

Symetra as directed by the CRATs constitute amounts distributed by the CRATs for purposes of section 664(b). Contrary to the Gerhardts' view, nothing in section 72 overrides their obligation to comply with the rules of section 664(b) with respect to those amounts.

In light of the foregoing, it is plain that the Gerhardts have not shown that the determinations in the notices of deficiency on this issue were incorrect. Therefore, they must be upheld.

II. *Docket No. 11129-20 (Additional Issues Relating to Jack and Shelley Gerhardt's Returns)*

*(1) Section 1031 Like-Kind Exchange Issue*

Next we consider whether, for the 2017 tax year, Jack and Shelley Gerhardt properly excluded gain from the disposition of other property (Armstrong Site) from gross income under section 1031 or whether that gain must be recognized under section 1245. The Commissioner does not dispute that the transaction at issue met the requirements of section 1031. Instead, the Commissioner argues that, despite section 1031, the gain must be recognized as ordinary income because the property was depreciated "section 1245 property." *See* I.R.C. § 1245. After finding the facts that follow, for the reasons set out below, we decide this issue in the Commissioner's favor.

*Background*

Located in Armstrong, Iowa, the Armstrong Site was held by Jack and Shelley as rental property for the production of income. It comprised hog buildings and equipment as well as raw land. On January 19, 2017, Jack and Shelley relinquished the Armstrong Site to Andrew Gerhardt intending that it be exchanged for like-kind property. On February 28, 2017, a new property, the Cape Coral property, was identified as the exchange property. On March 17, 2019, Jack and Shelley received the Cape Coral property from Andrew Gerhardt.

Jack and Shelley treated this exchange as a section 1031 like-kind exchange on their 2017 tax return. They reported a fair market value

---

to have followed this contractual provision by issuing Forms 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., reflecting each year's annuity payments to the CRATs, not the Gerhardts. And the Gerhardts have stipulated that the CRATs reflected the annuity payments as distributions on their Forms 5227, Schedule A, Part II-A, Current Distributions Schedule, for each relevant year.

of $390,000 for the Cape Coral property. They also reported $104,338 as "[a]djusted basis of like-kind property [they] gave up, net amounts paid to other party, plus any exchange expenses" not used elsewhere on their return.[39] Stipulation of Facts Ex. 10–J, at 17. Consistent with these amounts, Jack and Shelley reported deferred gain of $285,662 on the exchange of the Armstrong Site.

As already noted, the Commissioner examined Jack and Shelley's 2017 return. The revenue agent conducting the audit accepted the fair market value of the Cape Coral property and agreed that Jack and Shelley paid for the property with the Armstrong Site (valued at $300,000) and $90,000 in cash. But the agent made adjustments to Jack and Shelley's reported exchange expenses, as well as their reported basis in the Armstrong Site. And he determined that the gain from the Armstrong Site was subject to the rules of section 1245 and that the gain should not be deferred but should be treated as ordinary income. Consistent with these determinations, the Commissioner increased Jack and Shelley's income for 2017 by $284,746.[40]

*Discussion*

A. *Recognition Under Section 1245*

Typically, under section 1031, no gain or loss is recognized on a like-kind exchange of property if all requirements of section 1031 are met. But, if "section 1245 property" is disposed of in a section 1031 like-kind exchange, then gain from the disposition of that property may be recognized as ordinary income.[41] *See* I.R.C. § 1245(a)(1) (flush language), (b)(4); Treas. Reg. § 1.1245-6(b). If both section 1245 property

---

[39] The basis amount of $104,338 reported on Jack and Shelley's return consisted of reported basis of $14,338 in the Armstrong Site and exchange expenses, plus $90,000 in cash.

[40] This amount was equal to 100% of the gain from the exchange of the Armstrong Site as determined by the Commissioner. The Commissioner calculated the amount by subtracting selling costs and the adjusted basis of the land, buildings, and equipment, all as determined by the Commissioner, from the $300,000 sale price. The amount was slightly less than the amount Jack and Shelley reported as deferred gain because the Commissioner made certain favorable adjustments to Jack and Shelley's basis in the property.

[41] As relevant here, the amount recognized generally is limited to the amount by which the lesser of (1) the depreciation deductions claimed with respect to the property and (2) the amount realized in the transaction exceeds the taxpayer's adjusted basis in the property. *See* I.R.C. § 1245(a) and (b).

and non-section 1245 property are disposed of in the same transaction, then gain is allocated between the section 1245 property and the non-section 1245 property in proportion to their respective fair market values. Treas. Reg. § 1.1245-1(a)(5). Section 1245 property includes "property which is or has been property of a character subject to the allowance for depreciation provided in section 167" that, as relevant here, is either (1) personal property or (2) a single-purpose agricultural or horticultural structure. I.R.C. § 1245(a)(3)(A), (D).

B. *Application to Jack and Shelley*

The Commissioner determined that the hog buildings and equipment on the Armstrong Site were section 1245 property and therefore that Jack and Shelley's gain from disposing of the property was ordinary income to them for 2017. Jack and Shelley dispute that the gain should be recognized as ordinary income. They argue that the gain should be deferred because they exchanged the Armstrong Site for the Cape Coral property in a properly executed section 1031 transaction. Essentially, they say that section 1031 trumps section 1245, at least as to the timing of gain recognition.

There is no dispute that Jack and Shelley followed the formalities of section 1031. But Jack and Shelley's argument ignores that gain may still be recognized under section 1245 if the property disposed of is "section 1245 property." *See* I.R.C. § 1245(a)(1) (flush language) ("[G]ain [from the disposition of section 1245 property] shall be recognized notwithstanding any other provision of this subtitle."); *see also* I.R.C. § 1245(b)(4) (providing rules for gain recognition in the context of a section 1031 transaction). Besides their broad assertion that "[t]he buildings on the [Armstrong Site] are incidental to the property and part of the property," Pet'rs' Opening Br. 20, Jack and Shelley offer no arguments with respect to the Commissioner's determination that the Armstrong Site was depreciated section 1245 property. Nor do they contend that the limitations in section 1245(b)(4) assist them.

So far as Jack and Shelley may be arguing that their gain from the Armstrong Site is allocable primarily to non-section 1245 property, they have not set forth any facts supporting that view. The record does

not show how much (if any) of the gain from the Armstrong Site could be allocable to non-section 1245 property.[42]

In short, Jack and Shelley have not met their burden to demonstrate that the Commissioner's determination is incorrect, and we find for the Commissioner on this issue.

### (2)    Sale of Mosloski Site Issue

We turn next to the Commissioner's determination that Jack and Shelley did not properly report gains from the sale of an additional property, which the parties refer to as the Mosloski Site.

### *Background*

Jack and Shelley purchased the Mosloski Site in 1995. The Mosloski Site consisted of land, a hog-finishing barn, and hog equipment. On November 10, 2015, Jack and Shelley donated a partial interest in the Mosloski Site to their CRAT. Then on November 17, 2016, they sold their remaining interest in the Mosloski Site for $75,000. Jack received a Form 1099–S, Proceeds from Real Estate Transactions, that same day reporting the sales proceeds.

On their Form 1040, U.S. Individual Income Tax Return, for the 2016 tax year, Jack and Shelley reported total gain of $66,070 from the sale of the Mosloski Site as ordinary income. Along with their 2016 return, Jack and Shelley attached Form 4797, Sales of Business Property. On Form 4797, they reported a loss of $1,009 from the sale of the Mosloski Site land and gain of $67,079 from the sale of the Mosloski Site hog-finishing barn and hog equipment.

In the notice of deficiency issued to Jack and Shelley, the Commissioner determined that the sale of the Mosloski Site was subject to depreciation recapture under section 1245. And because "the recapture amounts [from the Mosloski Site] under [section 1245] and land basis amounts are included in the charitable remainder annuity trust amounts," the Commissioner determined that the gain reported on

---

[42] We note in this regard that, according to the revenue agent's workpapers, when Jack and Shelley purchased the Armstrong site they allocated approximately 1.6% of the purchase price to land (the non-section 1245 property) and the remaining 98.4% to buildings and equipment (the section 1245 property) for depreciation purposes.

Form 4797 was zero and that the entire $75,000 of sale proceeds was long-term capital gain to Jack and Shelley for 2016.

## *Discussion*

Jack and Shelley offer no argument as to this adjustment in either of their briefs. Therefore, they have forfeited any objection as to this adjustment, and the Commissioner's determination stands. *See Smith*, 159 T.C., slip op. at 41; *see also Muhich v. Commissioner*, 238 F.3d 860, 864 n.10 (7th Cir. 2001), *aff'g* T.C. Memo. 1999-192; *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

III.  *Docket No. 11146-20 (Tim and Pamela Gerhardt Section 6662(a) Penalty Issue)*

Finally, we consider whether Tim and Pamela are liable for an accuracy-related penalty under section 6662(a) and (b)(2) for a substantial understatement of income tax for 2016.

## *Background*

Tim and Pamela reported total tax of $4,836 on their 2016 income tax return. The Commissioner determined that they had a tax deficiency of $39,448 for that year. During the examination of the 2016 return, IRS Revenue Agent Michael Lumpp proposed the imposition of an accuracy-related penalty under section 6662(a). Supervisory Revenue Agent Emily McDowell, Revenue Agent Lumpp's immediate supervisor, personally approved the assertion of the penalty in writing on July 22, 2019. Revenue Agent Lumpp had not communicated the penalty determination to Tim and Pamela or their representative before obtaining written supervisory approval.

In the notice of deficiency, mailed to Tim and Pamela on March 10, 2020, the Commissioner determined an accuracy-related penalty of $7,890 under section 6662(a) and (b)(2) for an underpayment due to a substantial understatement of income tax.

*Discussion*

A.     *The Commissioner's Burden of Production*

Section 6662(a) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment of tax required to be shown on a return that is attributable to any substantial understatement of income tax. *See* I.R.C. § 6662(a) and (b)(2). An understatement of income tax is "substantial" if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or "$5,000." *Id.* subsec. (d)(1)(A).

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). The record shows that Tim and Pamela's understatement of income tax for 2016 exceeded the threshold amount under section 6662(d)(1)(A), so the Commissioner has met his burden to show the penalty under section 6662(a) was proper when the notice of deficiency was issued.

The Commissioner must also show compliance with the procedural requirements of section 6751(b)(1). *See* I.R.C. § 7491(c); *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Section 6751(b)(1) provides that no penalty shall be assessed unless "the initial determination" of the assessment was "personally approved (in writing) by the immediate supervisor of the individual making such determination." The parties' stipulations show that the section 6662 penalty was properly approved.

B.     *Reasonable Cause*

No penalty is imposed under section 6662 with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to [it]." I.R.C. § 6664(c)(1). Tim and Pamela have the burden to establish that they are excused from the penalty for reasonable cause. *See United States v. Boyle*, 469 U.S. 241, 245 (1985); *Sugarloaf Fund, LLC v. Commissioner*, 911 F.3d 854, 861 (7th Cir. 2018), *aff'g Kenna Trading, LLC v. Commissioner*, 143 T.C. 322 (2014); *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

"The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into

account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). Generally, "the most important factor is the extent of the taxpayer's effort to assess [his] proper tax liability." *Id.* Circumstances that may indicate reasonable cause and good faith include "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.*

Tim and Pamela argue that they have reasonable cause for the underpayment of tax for 2016 because they lacked relevant legal training and relied on tax advisers both in pursuing the CRAT transactions discussed above and in preparing their 2016 return. To show that their reliance on tax advisers constitutes reasonable cause, Tim and Pamela must show that their reliance was reasonable. *Boyle*, 469 U.S. at 250–51; Treas. Reg. § 1.6664-4(b)(1) ("[A taxpayer's reliance on] professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.").

Our Court applies a three-prong test to determine whether a taxpayer reasonably relied on professional advice. Specifically, we analyze whether "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A.*, 115 T.C. at 99. Reasonable reliance on a professional "is a fact-specific determination with many variables, but the question 'turns on "the quality and objectivity of the professional advice obtained."'" *Am. Boat Co. v. United States*, 583 F.3d 471, 481 (7th Cir. 2009) (quoting *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885, 904 (E.D. Tex. 2007), *aff'd sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009)). "Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about." *Neonatology Assocs., P.A.*, 115 T.C. at 98.

C. *Application to Tim and Pamela*

Based on the record before us, we are unable to determine that Tim and Pamela reasonably relied on tax advisers in preparing the return or pursuing the positions reflected in the return. The record does not demonstrate the qualifications of the advisers, the nature of Tim and Pamela's communications with them, or the quality or objectivity of the advice Tim and Pamela received. These facts are necessary to our analysis, and it was Tim and Pamela's burden to provide them. This they did not do.[43] Accordingly, we sustain the determination of the section 6662(a) penalty.

IV. *Conclusion*

For the reasons stated above, we find for the Commissioner on all issues.

We have considered all of the parties' arguments and, to the extent not discussed above, conclude they are irrelevant, moot, or without merit.

To reflect the foregoing and the concessions of the parties,

*Decisions will be entered under Rule 155.*

---

[43] Statements made in the Gerhardts' brief without any citations of the record are not facts on which we may rely.